### The AD HOC COMMITTEE OF AZ–NM–TX–FL PRODUCERS OF GRAY PORTLAND CEMENT, Plaintiff,

v.

### UNITED STATES, Defendant,

and

### Apasco, S.A. de C.V., and Cemex, S.A., Defendant–Intervenors.

No. 90–10–00508.

United States Court of International Trade.

March 5, 1992.

Kilpatrick & Cody, Joseph W. Dorn, Martin M. McNerney, Gregory C. Dorris and Damon V. Pike, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Vanessa P. Sciarra, Diane M. McDevitt, Office of Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, for defendant.

Skadden, Arps, Slate, Meagher & Flom, Thomas R. Graham and John J. Burke, for defendant-intervenor Cemex, S.A.

O'Connor & Hannan, Joseph H. Blatchford and Guy C. Smith, for defendant-intervenor Apasco, S.A. de C.V.

## OPINION

RESTANI, Judge:

Plaintiff, an association composed of United States producers of gray portland cement and cement clinker with production facilities in Arizona, New Mexico, Texas and Florida, challenges the final determination of sales at less than fair value by the United States Department of Commerce, International Trade Administration ("ITA" or "Commerce") in *Gray Portland Cement and Clinker from Mexico*, 55 Fed.Reg. 29,244 (Dep't Comm.1990) ("Final Determination" or "Final Det."). In the determination, ITA concluded that imports of gray portland cement and clinker from Mexico are being, or are likely to be, sold in the United States at less than fair value ("LTFV"). Plaintiff, representing domestic cement producers, challenges the level of LTFV margins. Cemex, S.A. ("Cemex") and Apasco, S.A. de C.V. ("Apasco"), Mexican producers of the subject merchandise, are defendant-intervenors in this action.

### I. Background

In response to a petition filed by plaintiff on behalf of the domestic cement industry, ITA initiated an antidumping investigation of imports of gray portland cement and cement clinker from Mexico. *Gray Portland Cement and Clinker from Mexico*, 54 Fed.Reg. 43,190 (Dep't Comm.1989).

On April 12, 1990, by notice published in the *Federal Register*, ITA issued a preliminary affirmative determination of sales at less than fair value. *Gray Portland Cement and Clinker from Mexico*, 55 Fed. Reg. 13,817 (Dep't Comm.1990). Following

verification of the questionnaire responses, ITA published its final affirmative determination of sales at less than fair value. Final Det., 55 Fed.Reg. 29,244.

On August 30, 1990, an antidumping duty order was published in the *Federal Register. Gray Portland Cement and Clinker from Mexico*, 55 Fed.Reg. 35,443 (Dep't Comm.1990).[1] In this order, Cemex was assigned a final dumping margin of 58.38% and Apasco—53.26%. A third Mexican producer not a party in this appeal, Cementos Hidalgo, S.C.L., was assigned a dumping margin of 3.69%. The "all other" category of Mexican producers and exporters of the subject merchandise received a dumping margin of 58.05%.

## II. Issues and Decision

Plaintiff raises three issues:

1. Whether ITA erred by comparing Cemex's home market and United States sales at two distinct levels of trade;

2. Whether ITA erred by deducting home market inland freight charges incurred by Cemex and Apasco from foreign market value ("FMV"); and

3. Whether ITA erred by not initiating a sales below cost of production ("COP") investigation of Cemex's home market sales of Type V cement.

Oral argument was held on February 20, 1992. At that time, the court ordered remand on the first issue and upheld ITA's decision on issues two and three. This opinion further explains the court's ruling from the bench.

## III. Discussion

A. Remand is necessary for ITA to explain its rationale for comparing Cemex's home market and United States sales at different levels of trade.

■ The "level of trade" regulation provides:

The Secretary normally will calculate foreign market value and United States price based on sales at the same commercial level of trade. If sales at the same commercial level of trade are insufficient in number to permit an adequate comparison, the Secretary will calculate foreign market value based on sales of such or similar merchandise at the most comparable commercial level of trade as sales of the merchandise and make appropriate adjustments for differences affecting price comparability.

19 C.F.R. § 353.58 (1991). Authority for this regulation is found in the statutory provision mandating adjustments to foreign market value for "other differences in circumstances of sale." 19 U.S.C. § 1677b(a)(4)(B) (1988).

During the period of the investigation, Cemex maintained that its pricing policies for sales of the subject merchandise did not vary according to the type of customer or the level of trade. Pub.R.Doc. 126 at 12. Rather, Cemex attributed price variance to the differing competitive conditions in different sales regions. *Id.* In the preliminary determination ITA treated all home market sales as if they were made at a single level of trade. *See* 55 Fed.Reg. 13,-817.

On June 13, 1990, Cemex raised the level of trade issue with ITA, arguing that ITA should not combine the sales to distributors with the sales to end-users in making the fair value comparison. Pub.R.Doc. 269 at 937–38. In comment 9 of its final determination, ITA stated: "[W]e determined that CEMEX had sufficient sales in the home market at the same commercial level of trade as its U.S. sales to permit an adequate comparison to all U.S. sales." Final Det. at 29,248. This statement is ambiguous. It does not reflect that ITA found

---

**1.** On November 13, 1989, the United States International Trade Commission ("ITC") published its preliminary finding that a domestic industry was materially injured by reason of imports of this cement. *Gray Portland Cement and Cement Clinker from Mexico*, USITC Pub. 2235, Inv. No. 731–TA–451 (Nov. 1989). In August

1990, ITC published its final affirmative determination. *Gray Portland Cement and Cement Clinker from Mexico*, USITC Pub. 2305, Inv. No. 731–TA–451 (Aug. 1990). The material injury determination is before this court in *Cemex, S.A. v. United States*, Court No. 90–10–00509.

two distinct levels of trade in each market and that it chose to make comparisons on two different levels, although the parties seem to agree that ITA did make separate comparisons. Absent from the final determination is an explanation of why ITA reversed its preliminary determination which combined distributor and end-user sales. Although ITA consents to remand to consider this issue anew, plaintiff requested that ITA be directed to follow its preliminary methodology.

As the court stated at oral argument, the level of trade issue must be remanded so that ITA may explain its analysis and rationale for concluding that Cemex's sales should be compared at two different levels of trade based on the evidence submitted in this case. The court declines to give further direction in view of the absence of reasoning and the presence of some evidence of two levels of trade. This issue requires further consideration by the agency before the court can make a determination as to ITA's level of trade methodology.

**B.  It was reasonable for ITA to deduct pre-sale inland freight expenses from FMV.**

▄ In its final determination, ITA deducted from FMV inland freight expenses that were incurred prior to the date of sale, stating:

> We have deducted from the U.S. price inland freight which represents movement expenses from the plant to the storage facility. Therefore, to ensure an "apples-to-apples" comparison, we have deducted movement expenses from the plant to the storage pick-up point on home market sales in our determination of FMV.

Final Det. at 29,251 (Comment 27). Plaintiff alleges that this deduction is contrary to ITA's standard practice of denying direct expense deductions to FMV for pre-sale inland freight charges and further, that the new procedure violates the antidumping law.

Pursuant to statute and regulation, ITA must reduce the United States price by any expenses "incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." 19 U.S.C. § 1677a(d)(2)(A) (1988); 19 C.F.R. § 353.-41(d)(2)(i) (1991). No corresponding provision exists with regard to FMV. Under 19 U.S.C. § 1677b(a)(4)(B) and the implementing regulation, however, FMV may be adjusted for differences in the circumstances of sale that are directly related to sales of the merchandise in the home market.[2]

Although Cemex and Apasco argue that ITA's determination is sustainable based on the circumstances of sale provision because the expenses are directly related to the sales, ITA did not rely on this provision in its treatment of home-market pre-sale inland freight expenses. Thus, ITA's determination as to this issue rests not on the circumstances of sales adjustment historically used by ITA,[3] but on a seemingly new

---

**2.** 19 U.S.C. § 1677b(a)(4) (1988) provides, in part, as follows:

**(4) Other adjustments**

In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

**(B)** other differences in circumstances of sale;

. . . . .

then due allowance shall be made therefor. The ITA regulation which implements this circumstance of sale provision provides as follows:

(a) *In general.* (1) In calculating foreign market value, the Secretary will make a rea-

sonable allowance for a *bona fide* difference in the circumstances of the sales compared if the Secretary is satisfied that the amount of any price differential is wholly or partly due to such difference. In general, the Secretary will limit allowances to those circumstances which bear a *direct relationship* to the sales compared.

19 C.F.R. § 353.56(a)(1) (1991) (emphasis added in last sentence).

**3.** Defendant admits, and a review of ITA determinations indicates, that in the past ITA, when U.S. purchase price is involved, has refused to grant a circumstance of sale adjustment to FMV for pre-sale inland freight charges, instead it has treated these expenses as nonallowable indirect selling expenses. *See* Defendant's Brief at 18; *Portable Electric Typewriters from Japan*, 45

approach that uses prices at the factory gates for comparison, which necessarily would involve inland freight deductions on both sides of the equation.

In this case, pre-sale movement expenses were incurred in both the home market and the United States market. The similarity of selling procedures in both markets distinguishes this case from prior ones discussing pre-sale costs. *See Silver Reed America, Inc. v. United States,* 7 CIT 23, 581 F.Supp. 1290 (1984), *rev'd on other grounds sub nom., Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.,* 753 F.2d 1033 (Fed.Cir.1985); *LMI—La. Metalli Industriale, S.p.A. v. United States,* 13 CIT 305, 712 F.Supp. 959 (1989), *aff'd in part, rev'd in part,* 912 F.2d 455 (Fed.Cir.1990). In both of these cases, pre-sales expense deductions were discussed only with regard to the home market side; thus, it was only the circumstances of sale provision which could justify a deduction.

Plaintiff views ITA's new approach as a circumvention of the circumstances of sale provision. The court doubts a circumvention is occurring because it would appear to be an unnecessary one. The court does not find the clarity in the circumstances of sale provision that is apparent to plaintiff. The obvious thrust of the statute is a fair comparison. The absence of language addressing a movement deduction in the FMV statute suggests no hard and fast rule to the court in view of Congress' broad direction to make adjustments for differences in circumstances of sale and its lack of direction as to which exact price factors to use. Even ITA's regulation is not as absolute as plaintiff would imply; ITA prefaces its direct expenses deduction rule with the words "In general." *See* 19 C.F.R. § 353.56(a)(1).

The court also notes that it cannot find the clear line between pre-sale and post-sale expenses that places all pre-sale expenses in the "indirect expense" category—a line so evident to the court in *Silver Reed* and used by ITA in the past.[4] If ITA's approach was reasonable in *Silver Reed,* the court finds the new approach, with its concentration on a level playing field, even more reasonable. In fact, cases since *Silver Reed* have not used absolute language, but have considered whether ITA's approach was acceptable given the particular facts. *See e.g., LMI,* 13 CIT at 313–14, 712 F.Supp. at 965–66, *aff'd,* 912 F.2d at 457–58.

ITA's primary goal when generating FMVs and United States prices for the purpose of a less than fair value determination is to compare "apples with apples." *See Smith—Corona Group v. United States,* 713 F.2d 1568, 1578 (Fed.Cir.1983).[5]

Fed.Reg. 18,416, 18,418 (Dep't Comm.1980) (final admin. review) (no adjustment for the costs of transporting subject merchandise from factory to distribution warehouse because expense not directly related to particular sale); *Television Receivers, Monochrome and Color, from Japan,* 53 Fed.Reg. 4,050, 4,052 (Dep't Comm. 1988) (final admin. review) (home market inland freight costs incurred before date of sale treated as indirect selling expense); *Color Television Receivers from the Republic of Korea,* 55 Fed.Reg. 26,225, 26,230 (Dep't Comm.1990) (final admin. review) (inland freight expense should be treated as indirect selling expense). Although they are capped at the U.S. expense level, as a general matter indirect selling expenses are allowed as an adjustment to FMV if exporter's sales price is used on the U.S. side of the equation. *See* 19 C.F.R. § 353.56(b)(2) (1991). This case, however, involves purchase price, not exporter's sales price.

4. In recent cases ITA has permitted a deduction for freight expenses incurred on home market sales. *See e.g., Red Raspberries from Canada,* 56 Fed.Reg. 677 (Dep't Comm.1991) (final admin. review). ITA has explained this change as follows:

In the past, the Department has treated pre-sale movement expenses incurred on home market sales as either production costs or indirect selling expenses. However, we have reconsidered our treatment of these expenses. The Department does not distinguish between pre-sale and post-sale movement charges when calculating an ex-factory U.S. price. Therefore, to ensure an "apples-to-apples" comparison, the Department has deducted all movement charges, pre-sale and post-sale, from foreign market value.

*Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Certain Components Thereof, from Japan,* 56 Fed.Reg. 26,054, 26,056 (Dep't Comm.1991) (final admin. review).

5. Although plaintiff argues that the "apples-to-apples" policy argument set forth in *Smith— Corona* involved an offset to exporter's sales price, the principle is a general one which has application for all dumping comparisons.

As the Federal Circuit explained in *Smith–Corona*, a "fair comparison" is required. *Id.* In the case at bar, ITA reasoned that to obtain an "apples to apples" comparison, the ex-factory price in the United States should be compared to the ex-factory, not the ex-warehouse, price in the home market. The court is loath to tell ITA it cannot be more fair than it has been in the past when the statute would seem to allow it some room to make the fairer choice. The deduction of pre-sale inland freight expenses on the home market side engenders a more accurate and meaningful comparison in this case than does plaintiff's approach or any absolute rule based on pre- and post-sale costs. ITA's determination is sustained on this issue.

C. ITA's decision not to initiate a cost of production investigation of Cemex's Type V cement sales is sustained.

■ During the investigation, plaintiff requested that ITA initiate a sales below cost of production ("COP") investigation with respect to Cemex's home market sales of Type V cement. ITA rejected this request stating:

Because such sales [of Type V cement] comprise less than [ ]⁶ percent of the relevant "such or similar" category, we would not disregard any of these sales for purposes of calculating foreign market value (FMV) even if we were to find all of these sales to be sold below cost. This [ ] percent volume falls far short of the quantitative threshold that we evaluate, among other factors, to determine whether to disregard below cost sales. *See Timken Co. v. United States*, [11 CIT 786, 806–07], 673 F.Supp. 495, 514–515 (CIT 1987).

Because we could never achieve the intended purpose of the COP statutory provisions in this case, *i.e.*, the exclusion of

below cost sales for FMV purposes, initiating a cost investigation under these circumstances would be a futile exercise. Pub.R.Doc. 182 at 1808–09.

Plaintiff argues on appeal that ITA calculated a separate FMV for home market sales of Type V cement apart from the FMVs calculated for other cement types and therefore, ITA should have examined the COP for Type V cement standing alone. Plaintiff alleges that all or almost all of the Type V cement sales were below cost.

19 U.S.C. § 1677b(a)(1) (1988) provides that "[t]he foreign market value of imported merchandise shall be the price ... at which such or similar merchandise is sold [in the home market]...." 19 U.S.C. § 1677b(b) (1988) provides in part as follows:

Whenever ... [ITA] has reasonable grounds to believe or suspect that *sales in the home market* of the country of exportation ... have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If ... [ITA] determines that sales made at less than cost of production—

(1) have been made over an extended period of time and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade

such sales shall be disregarded in the determination of foreign market value.

(emphasis added). In other words, in order to disregard sales made below COP, ITA must find that the relevant sales were made in "substantial quantities" and over an extended period of time.⁷ *Id.* The reg-

---

6. Although this figure is confidential, the parties noted in oral argument that it was a very small number. The court would call it miniscule.

7. ITA practice is not to disregard below COP sales if they "constitute 10 percent or less of total home market sales of the such or similar category of merchandise." *Tubes for Tires, Oth-*

*er than for Bicycle Tires, From the Republic of Korea,* 49 Fed.Reg. 26,780, 26,782 (Dep't Comm. 1984) (final admin. review). In *Timken Co. v. United States,* 11 CIT 786, 673 F.Supp. 495 (1987), the court concluded that ITA's practice of disregarding below-cost sales that represent less than ten percent of total home market sales was a reasonable interpretation of the term

ulation implementing this statute, 19 C.F.R. § 353.51 (1991), reads as follows:

(a) *Disregarding sales at less than cost.* If the Secretary has reasonable grounds to believe or suspect that the *sales on which the Secretary could base the calculation of foreign market value* ... are at prices less than the cost of production, the Secretary, in calculating foreign market value, will disregard such sales if they:

(1) Have been made over an extended period and in substantial quantities; and

(2) Are not at prices which permit recovery of all costs within a reasonable period in the normal course of trade.

(emphasis added).

The question is which group of sales is at issue—the full "such or similar merchandise" group of sales or a particular subcategory of "such or similar merchandise," that is, "the sales on which the Secretary could base the calculation of foreign market value." In this case, a separate FMV for Type V sales was calculated by Commerce. Only the Type V FMV was used in making the fair value comparisons between Cemex's Type V cement sales in the United States and those in the home market. Thus, the sales used by Commerce for calculating FMV for Type V cement were the Type V home market sales which were alleged to be below COP.

ITA's statement of reasons in its determination causes the court some concern. Because it has subdivided the "such or similar merchandise" for purposes of price comparisons, it could be basing a part of the margin on a price-based FMV that should have been replaced by a cost-based FMV. The ten percent rule used in the past has been approved in the context of a unitary "such or similar merchandise" category. *See Timken,* 11 CIT at 806–07, 673 F.Supp. at 514–15. Thus, the court has not previously approved ITA's reasoning that even when it subdivides "such or similar merchandise" for FMV and U.S. price comparison purposes, it may nonetheless reaggregate the "such or similar" category for purposes of its ten percent rule. The

"substantial quantities." *Id.* at 806–07, 673

court leaves this issue for another day because, whatever the correct approach, it would not order ITA to undertake a COP investigation in this fair value investigation.

The court made it clear at oral argument that, in view of the miniscule amount of Type V cement imported into the United States, it was interested in any evidence indicating that the margin, which applied to all types of cement in the such or similar category, would change if a COP investigation were undertaken as to Type V cement. Plaintiff did not offer evidence that the weighted average might change by even one-hundredth of a decimal point if ITA undertook a COP investigation of the Type V cement. While its burden of showing potential for a margin change may not be great given its lack of access to particularized cost data, under these circumstances some showing was needed. Given the uncontradicted statements of the defendant that the margin would not change, the court concludes a COP investigation would be useless at this stage and need not be undertaken.

## IV. *Conclusion*

Remand is required as to the level of trade issue and ITA is directed to explain its rationale for whatever approach it chooses. The court concludes that it was reasonable for ITA to deduct pre-sale inland freight expenses from FMV because such a deduction would permit an accurate comparison of United States price and FMV and the statute and regulations do not prevent such a deduction under the facts of this case. ITA's decision not to initiate a COP investigation will not be disturbed where the number of sales alleged to be below cost was so insignificant as compared to the total number of sales that no margin change could be expected.

*Remanded.*